Case No. 20-1142, et al. PSSI Global Services, L.L.C., a state-of-Nevada limited liability company, Appellant, v. Federal Communications Commission. Mr. Diaz-Gavin for the Appellant, PSSI Global Services, L.L.C. Mr. Wright for the Small Satellite Operator, Appellants. Ms. Boisel for the Appellee. Mr. Garangia for the Wireless Intervenors. Mr. Werners for the Intervenor, SES Americam, Inc. Good morning. Before we get started, I just have one housekeeping matter. The parties filed a sealed appendix in this case, but the briefs were not filed under seal, and no one has requested to conduct this oral argument under seal or as a closed proceeding. And so we are operating under, on the basis that there will be nothing referenced from the sealed appendix during argument. We don't intend to reference anything from the sealed anything, at least specific information, identifiable information from the sealed appendix. And so that's the basis upon which we are proceeding. And if any party disagrees with proceeding in that fashion, they should let us know at this time. Otherwise, we will go forward. Does anyone have an objection to that? Okay, hearing none, we'll hear from, I guess, Mr. Gavin. Thank you, Your Honor. I've reserved a minute and a half for rebuttal. May it please the Court, my name is Steven Diaz-Gad, and I'm representing the Appellant Petitioner, PSI Global. My argument will focus on two statutes, Section 316 of the Communications Act and the Orbit Act. I will address them in turn. Although under Section 316, the Commission can modify a license, this Court has made clear in community television and subsequent cases that such authority does not extend to the FCC's making a fundamental change in that license based upon the Supreme Court's holding in MCI v. AT&T. The verb to modify the Supreme Court said means to change moderately or in minor fashion, and has a connotation of increment or limitation. In fact, the order has so fundamentally changed PSSI's transportable licenses, the authorizations for the satellite trucks that are essential for providing live events programming, so as to threaten the transportable business. In community, this Court affirmed a modification because the licensees begin and end the transportable under very similar terms, one channel digital or one channel analog, not so here. The order takes away 60% of the spectrum available for operation of the transportables and imposes multiple technical limitations in the spectrum that remains. This is a fundamental change, precisely what the Court said was impermissible in community and cell code. PSSI cannot provide the same level of services when 60% of the spectrum is taken away. As can be seen from one of the licenses- If the Council, if the Commission makes a finding that this is not a fundamental change as a factual matter, and they explain that finding and the evidence that they are basing that finding upon, then that is something that we owe deference to unless it's not based upon substantial evidence. Is that correct? Your Honor, I think that there is substantial evidence that shows the contrary, that this there has been a substantial change in the license. But I guess you would agree that as a legal matter, we would review that for substantial evidence. As a legal matter, you could review that for substantial evidence, yes. Okay. And is it the case, Mr. Gavin, that your side could have some substantial evidence, FCC could have some substantial evidence, and in that situation, we have to rule for the FCC? No, not necessarily, Your Honor, because we have to go back to what is the statutory interpretation of Section 316. And as I indicated, the decisions of this Court, based upon the Supreme Court holding in MCI v. AT&T, is that there cannot be a fundamental change in what is the license. And there has been- But I think Judge Wilkins was asking about questions of fact, factual disputes. As to the- We are presenting substantial evidence that demonstrates that our- But again, Mr. Gavin, I think the standard, and please correct me if I'm wrong, is when it comes to a factual dispute, has the FCC provided substantial evidence? And I could be wrong here, but let's take, for an example, a factual dispute. You say that you won't be able to continue servicing your customers, and the FCC says that you will, and in fact, your customers, everybody from Disney to Viacom, says that you will. So, if the FCC has put before us substantial evidence that you will be able to continue doing what you used to do, in terms of servicing your customers, then on the dispute of whether or not that's true or not, we have to agree with the FCC if they provide us substantial evidence. Do you agree with that? Your Honor, I return to my point that I think that we haven't gotten to the- This is not a situation where we're giving deference to the Commission's judgment because they have ignored the dictate of the statute that a modification is not a- I agree. So, Mr. Gavin, I agree. It's for this Court to decide the meaning of fundamental- find the meaning of modification, and our precedents tell us that in order to define that meaning, we look to the distinction between a modification and a fundamental change. But in order to take that test and apply it to certain facts, we have to figure out what the facts are. One fact might be you can continue doing everything you did before. One fact might be you can't do things that you used to do. And that's a disputed fact. We have to figure out, well, who's right? And you say you're right, FCC says it's right, and I believe that so long as the FCC produces substantial evidence and puts it before us that they're right, then we have to agree with the FCC on that disputed fact. Right? Your Honor, if we are dealing with simply have I presented substantial evidence or has counsel for the FCC presented substantial evidence, the cases will- you will defer to the FCC on substantial evidence. Okay, and in terms of the evidence that you produced and put before the FCC, let's exclude the evidence that you've put before us as a reviewing court that you did not originally provide to the FCC. If we're only talking about information you provided to the FCC, I understand you told the FCC about the Iowa State football game. That's correct. Any other, which they say the guard band satisfies, put that to the side for a second. Any other evidence that you provided to the FCC that would be, that would show that when you're limited to 4.0 to 4.2, you can't do what you used to do? Your Honor, first of all, we, we, we, the, the very basic that we at several points in during the proceeding, we noted that the difficulty of being able to coordinate to do frequency coordination, for example, in order to, in order to be able to make the connection for our satellite, we had argued that before. The particular example that the commission is, that the commission has questioned is the, is the Miami Hard Rock Stadium example that we used and included in the, and is before the court. It's simply an illustration of the points that we were making previously. That's not something new. That's not a new argument that we raised. Yeah, no, I know it's not a new argument, but I'm just, I'm not asking about what arguments you made to the FCC. I'm trying to figure out, aside from the IFSAE-DXIT that you submitted to the FCC, what, what evidence, what data did you provide them? Other than take, take your word for it. Your Honor, among other things we provided them, we provided them evidence during the course of the difficulties of being able to protect the signal because of filtering. We provided example of our, in, I believe it was in May of, in May of 2019. And again, in comments after we'd done a formal test, the difficulty of being able to protect the signal because of the electronic interference that was coming, the power interference. I mean, that's the biggest, the biggest problem is the power level. You're putting a satellite signal that's coming down to earth at, at a level of 0.1 to the 19th decimal point, a number so small that I'm not sure that I've even properly stated it. That goes to the, that goes to the interference problem, right? That goes your, that goes, Your Honor, to two things. It goes to the interference problem, but it also goes to the, the, the, the difficulty of operating in an environment where your signal is so saturated by the signals that are being emitted by the 5G transmitter. So it's not just, it's not just, it's not so much a frequency issue as it is a power saturation level issue. If I'm remembering right, you told the FCC that you could sustain a loss of 200 megahertz. And now you say you can't sustain a loss of 300 megahertz. I guess, what, where can I go in the record to find that you produced evidence more than just your say-so that there's something about that extra hundred megahertz that allows you to service your current and future customers  in a way that you wouldn't be able to do if you lost that extra hundred? Well, Your Honor, if I could start, could take us all the way back. We initially said that we, that the ideal solution for the, for the C-band was no spectrum. I get, I get that, but I think at some point you eventually said that you could sustain a loss of 200. We said at some point that we could sustain a loss of 200 because C-band Alliance, the then existing group of satellite consortia had put 200 megahertz onto the table. And we felt that there, in order to try to make this proposal move forward, but we did provide evidence, even at the 200 level, those studies that I referred to on the interference problem were for the filtering. And I believe that we also, I will go back to the record, Your Honor, but I will note that we raised the argument of the difficulty of being able to coordinate where you don't, where you lose the frequency pair for the uplink satellite that is linked to the downlink satellite. So we raised that point to the commission and I will, I can go back and supplement the record for you. And I'll stop asking questions now. Maybe in your rebuttal, if you can give me the JA pages that talk about those two experiments that you submitted or what not. Okay. Thank you, Your Honor. Thank you. Your Honor, I had an argument that I wanted to raise in addition to this regarding the Orbit Act. Briefly, please. I'll just ask you, why doesn't Northpoint take that off the table? Because, Your Honor, as we noted in Northpoint 1, specifically, the commission, this court said that the facts would be different if it was a service where there was currently international and global services being provided, which is specifically the case for which there's substantial evidence in the record. The interpretive question is, what does the phrase used for mean? Does it refer to the old use or the new use? And we said that the commission could permissibly construe that to refer to the new use, and the new use here is not satellite. Well, you said, in Northpoint 1, Your Honor, you said that Northpoint 2, which was decided two weeks later and involved a service which was strictly a domestic service, the 12 GHz MPDDS service, which involved a band where there was nobody currently using the band for international service. In our case, this band is specifically being used to transmit programming to and from the United States, which appears to be a pretty evident international service. The Congress' position was not just that you shouldn't auction this. It was not withstanding any other provision of the law. It should not be. It's interesting that in noted that the commission had even noted that it construed the relevant language of Section 765F of the Orbit Act to focus on whether the particular spectrum being assigned is used for international or global satellite communication services. They didn't even do that here, Your Honor. They just simply said, we have the authority to do so. Where spectrum is being consistent with your holding in Northpoint 1, where spectrum is actually being used for global and international service, as it is here, the auction is prohibited by the Orbit Act. We are out of time, and we rest on our briefs on the other issues that we raised, but we request that the Court vacate the order. All right. I'll give you a little bit of time on rebuttal. We'll hear from Mr. Wright. Thank you, Your Honor, and may it please the Court. I'm representing the SSOs, which are the three smallest of the eight satellite operators licensed to use the C-band. Your voice is barely coming through. If you could turn up your mic or get closer to your mic, please, sir. I will do my best, Your Honor. I'm in my office, and our IT guy is going to turn up the mic, I hope. All right. Say something now, because I think it was getting better. Well, thank you, Your Honor. Let me dive in on modification. The question before the Court is really a legal issue subject to Chevron standard. It's what the word modify means, and whether it can bear the interpretation that it should. The question is, and I think that's the mission given here, which is that it just means you can serve your existing customers, and we think that's plainly wrong, where we've lost 60% of our spectrum. The question is whether licenses were modified. It's never been a question before. This is a completely unprecedented interpretation of the law. It's completely unfair to new entrants, such as my clients, who had to invest tens of millions of dollars before they could make a single dollar. We've detailed ABS's experience in some detail in our brief to show that it built a satellite that can provide service until 2042, and yet the commission is taking away 60% of what it can sell, and that seems to us to clearly be an unreasonable interpretation of the word modify, so we're challenging the existing customer standard here. I think we don't, therefore the court doesn't need to get to the FCC argument about whether or not our clients could have sold more than 200 megahertz of spectrum in the next couple of decades. As we've explained in our brief, we think they're fairly wrong on that, but first and foremost, it's a legal issue. With respect to the facts, with respect to our clients, the commission has contradicted itself. It says that the CONUS model where you sell service within the continent of the United States has essentially lost out to fiber, and then it blames us for doing an intercontinental approach under which we would bring video and other services into and out of the United States to different countries, and then rely on fiber in the United States. Again, I don't think the court needs to reach that issue, but modification means a change in incremental or minor fashion, as the court said in self-help, and the focus should be on licenses, and taking away 60% of the license is more than a modification. Didn't the commission find that the remaining 200 megahertz would be enough, not only for existing customers, but for any reasonably expected future demand? So, it said that. I would say as we've shown that it clearly adopted an existing customer standard, and then fell back to saying, well, and USSOs are unlikely. Suppose that finding of fact about current and reasonably expected future demand is not clearly erroneous. Why wouldn't that be more than enough to cinch up their case on the legal question? I mean, you're losing 60%, but turns out that doesn't matter much, because any demand and, excuse me, any future demand can be met. Well, Your Honor, again, I'd stress that if you look at their reasoning for that, it contradicts itself. They say there's no future demand we would have to sell satellite service within the continental United States. That's not what we're planning to do, and basically just ignored that. Let me turn to our fair notice however, where the applicable standard of review is much less favorable to the Commission. Now, again, this is, let me say that this existing customer standard was unprecedented here. The Commission has always made licensees in our position whole. They often move, as Mr. Gavin was saying, somebody with a 6 MHz to 6 other MHz and pays the relocation or has the new license and pay the relocation. That's what we expected here. We have no reason to think that we wouldn't keep the same amount of spectrum one way or another or be compensated for our losses. Let me just say that the most recent case, the 24 GHz case from 2018 is very much like this case. The Commission cleared broadcasters to make room for 5G and it offered to pay them if they didn't want to get moved but simply wanted to trade 6 MHz here for 6 MHz there. Under Trinity Broadcasting, one of the most relevant fair notice cases, the Commission does not do any deference when applying an unprecedented rule like the existing customer standard. Rather, the issue is whether its interpretation of the statute was ascertainably certain. That's a 242 F3  and in this case not only was it ascertainably certain that the Commission was going to apply the existing customer standard, our clients had no reason at all to believe that such a standard would be used here. Mr. Wright, can you tell me  if we assume that the FCC's order did not apply a blanket existing customers standard but instead applied a standard that considers past customers, present customers and reasonable expectation of future customers found in the context of small satellite operators that there was no reasonable expectation of future customers and so there, as a shorthand for that fairly the all-encompassing test referred to it as the existing customers test. If I think that's how the order is best read, did you have notice of that? No, Your Honor. And why not? Well, the Commission, the best case is motion. In every other case, the Commission hasn't looked into anything like this or thought about whether or not a licensee could get by with less spectrum. It's fully compensated them. It's said this on many occasions because it recognizes the importance of, you know, it does impact expectations. But motion, again, their best case is helpful for us. It's the only one where a licensee lost spectrum without compensation for losing that spectrum. But that case is so different than us. The Commission decided to move a licensee from 28 MHz to a 20 MHz clock. And the licensee was very happy about that because international coordination rules had rendered this 28 MHz clock nearly useless. And so, as the Commission's order shows, it welcomed the change. It was another company that complained to the Commission that it shouldn't do that to motion. So, in light of that background, the most notice we have concerning what the Commission might do is they might say, okay, we're taking 300 to 500 MHz and we're gonna give you 420 better MHz of license spectrum somewhere else. If they did that, we wouldn't have complained if they did what they've done so many times before and say, well, we're gonna move you somewhere else but we can't find it so we'll give you vouchers to participate in the upcoming auction or we'll compensate you in some other way. That's what we have fair notice of and let me just say that Why do you need fair notice that they might defend their order with the notion of existing customers as relevant to modification? I mean, that's just part of the justification they're using to explain why they're shifting spectrum. It was crystal clear that the notice told you they were planning on shifting spectrum. Why isn't that good enough? And you could make whatever arguments you want about why they shouldn't. They've just never done that before without making cards whole and as we quoted in our briefing they constantly said that in order to induce people to build out licenses Just on the notice point you said they've never done that without making people whole I understand that's one of your substantive arguments but just not seeing on notice The whole point of this from the outset was to shift satellite spectrum into 5G spectrum and everyone knew that's what was at issue. Everyone commented in the administrative proceedings about why that was a good or bad idea Right and our clients weren't obstructionists we ultimately we said okay but let me just point to one of the places JA339 the government suggests that we just said go ahead and take our spectrum Every time we said it's okay to repurpose the CBAN your honors FCC we added something like but of course we expected it will be compensated for relinquishing our spectrum use rights and as I say that just always happens most of the time the commission has replaced it it's getting harder to replace spectrum so as I said in the most recent example the 24 gigahertz case they gave licensees an option to get a voucher to participate in the upcoming auction or to take cash and you know we would have welcomed no resolution on that sort but we just had no notice that we would lose spectrum without being made whole and it certainly it just wasn't ascertainably certain the commission has now repurposed spectrum many many times without ever doing this and again I say that the commission's best case motion which is in fact nothing like this let me turn if I may to you know the commission also while not compensating the SSO's in any way the commission compensated the other five operators with 15 billion and we presented the FCC with this clearly superior alternative that they just brushed off because I don't think they had a good answer under which every operator could get fairly compensated for the loss of spectrum every operator could get their relocation costs covered relocation costs to do things quickly and the larger operators with existing services could get a proportionate profit from doing all this and that could have been done for 6.4 billion rather than 15 billion and so of course our main concern is that the commission has given a war chest to our competitors some of whom are failing and now have 9.7 billion and 10 or 12 new satellites that they can probably use to move into the intercontinental market and this was just unreasonable the commission's explanation for this was that it would be a gamble not to pay 9.7 billion in absolutely pure payments to do something the larger satellite operators said they could do relocate by 2023 the only answer we got to our proposal was that it would be a gamble and the commission has explained in its brief that the gamble was that IntelSat and SES might bring a lawsuit to challenge the commission's legal authority to reduce its spectrum and SEC adds the commission is confident it would prevail so there is a reasonable alternative that would have saved the government 8.6 billion and kept that money from our competitors and the commission's answer is that they were afraid that there would be a lawsuit that had no merit and so I think that's just not a reasonable explanation the commission also suggested there would have been an auction delay if it had adopted a reasonable alternative Mr. Wright, you're over time so I'm just going to ask you to bring it to a conclusion unless my colleagues have questions for this part of the argument certainly let me just say their concern about auction delays is unfounded SES and IntelSat have come to this court and said you need to stay watching because 8.6 billion is not enough and there's no public interest favored by giving this money to the corporate government thank you all right, thank you we'll give you some time on rebuttal so I believe next up is Ashley Boisel for the Federal Communications Commission Good morning may it please the court Ashley Boisel for the Federal Communications Commission what the commission did here was exercise its broad spectrum management authority to repurpose underutilized spectrum in order to facilitate the immense and undisputed public benefits of rapid 5G deployment the commission undertook this based on representations by the satellite incumbents including the small satellite petitioners that they could provide their services in the reduced 200 MHz allocation with compression and other readily available technology the commission's action here both in terms of the 316 modifications of specific licenses and the setting of the accelerated relocation incentive payment was in service of the public interest and warrants deference and I think that the panel's questions suggest that you understand that what the commission did here was apply a comparable service standard that looked both to the level of existing customers as well as evidence that went to the credible likely future business and the commission expressly found that the upper 200 MHz allocation would accommodate both the existing level of business and the incumbent's ability to expand their business in the future that comparable service standard is consistent with the text of the Communications Act and it's consistent with this court's precedent in cases like Community Television and Celco Partnership and California Metro with respect to the textual argument. Ms. Boiesel on that point that you just made about how the order considered a potential future customers reasonable expectations of them is there anything in the Metro Innovator's brief in terms of what that brief suggests this court should do? Is there anything in it you disagree with? Yes. We think that what the amicus are asking for is a determination by this court about the legality of an existing customer standard and that is not what the commission applied here the commission applied a comparable service standard and since the question of the legality of an existing customer standard alone is not squarely presented here we don't think that the court needs to reach that question instead as I said the commission applied this comparable service standard which ensured that the satellite incumbents and the earth station incumbents could provide substantially the same service after the modification I guess you're not defending the existing customer standard you're saying you don't want us to rule it out for the future but I guess I would be curious why I know you don't think we should reach it but why would it be wrong to rule it out for the future? It does seem like an arbitrary and capricious standard Well I think there may be opportunities in the future to address that question squarely but as I said that's not what the commission did here and to the extent the court may have concerns about the commission's consideration of things like reliance or investment I think that the court can take solace A in the fact that the commission looked at those factors here and B those are the kinds of considerations that would typically play a part in a public interest analysis and 316 is tethered to public interest determinations so I think In this case Ms. Boisel I'm sorry you're hearing some construction work nearby in this case if you had said small satellite operators we are not going to look at any potential future customers we are only going to look at your existing customers Would that have been arbitrary and capricious in this case? Well I think that we can see that it's appropriate to look at evidence in the record of reasonably credible future business prospects particularly for newer entrants although I quarrel with the characterization of these small satellite operators as new entrants they've had market access for quite some time as to the existing customer and existing service standard that appears in this order I think Judge Walker some of your questions seemed to understand that the existing customer and existing service information was particularly salient here because there was evidence in the record that the market was declining and as a result of the fact that there were these long-standing satellite incumbents in a declining market, the existing customers were particularly relevant and salient data point in ensuring that the incumbents could continue to provide substantially the same service after the modification as they could before I want to move with the Court's indulgence to the accelerated relocation payment amount as a preliminary matter I think that it might help to contextualize that amount against the Commission's specified objectives and it set forth those objectives in the discussion of this amount in paragraphs 211 to 226 of the order and it made clear that what it was trying to do was maximize the likelihood that these satellite incumbents would voluntarily opt in to clear both themselves and thousands of earth stations on an accelerated basis and in addition to that objective it wanted to ensure no service disruption that the amount was an amount that the incoming overlay licensees were willing to pay and that it increased the value of the transition overall to the public this $9.7 billion figure achieved all of those objectives and the Commission reasonably explained why it was engaged in a no precise answer based on imperfect information because the large satellite incumbents had no incentive to divulge what they would accept so the Commission started by evaluating the upper bound and as it explained that upper bound was a conservative estimate of the market value of acceleration to the overlay licensees and then it selected a number close to that upper bound because again it was looking to maximize the likelihood of voluntary accelerated clearing on the understanding that that would result in social and economic benefits on an order of magnitude greater than the market valuation of acceleration to the overlay licensees and some estimates suggested that that would mean $15 billion a year for each year of acceleration so $30 billion total hundreds of thousands of jobs American leadership in 5G with attendant national security interests so I want to push back against this narrative that in selecting that number the Commission advocated its responsibility to the public interest that's simply untrue there are different ways to enrich the public and the Commission ensured that the treasury revenue was accrued via the public auction and that the public also reaped enormous social and economic benefits aside from the treasury revenue with respect to some of the representations by petitioners council as I said I think the panel understands that the Commission relied on substantial evidence in the record in determining that both PSSI and the small satellite operators could continue to provide service in the reduced 200 megahertz allocation PSSI failed to offer sufficient evidence to suggest that its ability to run its business would be eliminated and the small satellite operators failed to overcome countervailing evidence in the record that the market was in decline or to demonstrate that they would be able to lure their customers away from their larger satellite competitors with respect to notice I think Judge Katzen some of your questions indicated that you understand that it may not be the case here that particularized notice was required of course it's our position that it wasn't and that this is not a sanction and that there was adequate notice that the Commission could exercise its broad spectrum management authority in this manner and with respect to the small satellite operators and the evidence that they submitted I also want to point out as I did in my introductory remarks that they actually favored the reduction of the 200 to the 200 megahertz allocation and that Judge Walker I think it was you who remarked that PSSI had also suggested that it would be okay with a reduction of spectrum here if the panel has no further questions I'm happy to address other issues but otherwise Judge Walker I do have one I have a question on the small satellite operators standing I don't think they have standing to challenge the payments from one company to what about their standing to challenge pretty much everything else would you agree that they have standing to raise all the other claims that they raise well we certainly didn't take the position in our brief that they lack standing but this court can of course reach that conclusion in its own judgment and I certainly don't want to be in the position of persuading you that they do but again that's not a position that we took in our brief that's fine I'm good thank you if there are no further questions then we ask that the commission's order be affirmed in its entirety all right thank you counsel and we will hear then I guess from the wireless intervener yes thank you Peter Karangia for the wireless interveners and we appreciate the court granting us time I'd like to begin Judge Walker with your question about the amicus and this is a an important issue to us because our clients have an extremely strong interest in having this order affirmed in our view it's critical to free up much needed 5G spectrum that our customers are demanding and that will enable a raft of innovative services that will promote telemedicine telework which we're all doing now internet of things and a number of new other innovations yet to be imagined so we have a strong interest in seeing this order affirmed but we also have a strong long term interest because we are licensees and we have no appetite for granting the FCC a blank check on section 316 modification authority as the amicus alleges and as the SSO's allege and we simply don't think that this order did that first of all I think the critical point on that is the arguments from the other side rest on a misreading of the order they assert without basis that the commission applied a singular existing customer standard which is simply not true and I would point the court to paragraphs 32 of the order paragraph 139 of the order paragraph 196 of the order where it is crystal clear that the commission not only considered existing customers of which there were practically none but also looked at reasonable business opportunities and we think that's important because it reflects a recognition which is appropriate of investment backed expectations where there are such expectations and so for example our clients have put enormous investments into their many hundreds of millions of dollars in fact they're subject to build out obligations so yes if the commission tried to sort of take away substantially all of their spectrum we think that would be an issue but I think the critical point here is these section 316 questions are not analyzed in a vacuum they are undergirded by a fact intensive analysis which I think has come out in the questions during the earlier colloquies and moreover that fact specific approach is supported by this court's precedent we cited in our intervenor brief a case called P&R Temer which said look when we're looking at this stuff we go beyond the form of the license we're not just looking at the words in a license we have to look at the real world impacts or as Judge Caxter said I think the phrase you aptly used in the earlier case was what are the facts on the ground and I think when one looks at the facts on the ground that really is fatal to both PSSI and the SSO's for two reasons first they each conspicuously fell short in meeting their burden of proof before the commission they tried to throw in a bunch of additional post order evidence in connection with their stay motion which this court denied in the form of declarations which tried to clean up things but frankly we don't think they would have moved the needle if they had been considered but in any event as this court knows post record evidence like that is inadmissible effectively. Secondly as this court has recognized the substantial evidence standard is fatal to these arguments the factual underpinnings of the commission's 316 analysis are well supported in the record and under that very deferential standard the commission must prevail the other point I would make on the amicus brief arguments is and we made this point as well in our intervenor brief you don't look at these issues in a factual vacuum as if to say that the commission can just ignore the APA of course everything the commission has to do is look at the APA of course the commission has to look at the APA that means the commission has to look to reliance interest in virtually any context whether you look at that through the lens of what is a modification or not a modification or whether you look at that through the lens of is it in the public interest and we've cited you know cases this is black glitter law the commission has to like any agency look at reliance interests it has to explain its decisions cogently and we believe it did all those things here so we simply have no concerns about what the order set forth as a relevant standard and what that means for future cases we think that the order should be construed as setting forth a holistic analysis that is heavily immersed in the facts we think that's what the commission did here now on the acceleration payments point my only addition there is to just point out perhaps an obvious fact which is we're the ones paying those we the wireless industry that that's on our dime you know yes 99.7 billion dollars is a substantial amount of money of course but the commission was making a difficult and critical decision here how do we draw the line in figuring out effectively what is the lowest amount we can set that would nevertheless sufficiently incentivize clearing on an quite expedited basis they basically cut two years off the clearing a timeline from 2025 which is the outside deadline right that's that's what all the incumbents must meet the 2025 deadline and they said we can effectively move this forward by two years to the end of 2023 by providing you a carrot and they actually refer to sort of using a carrot and stick approach which is entirely proper unless my colleagues have questions I'm going to ask you to bring your argument to a conclusion you're over time so we have interests on both sides of the equation we stand by what the commission did and we ask the court to refer all right Judge Walker Judge Katsas any questions for counsel no all right thank you thank you and we'll hear for counsel for intervener SES Americom thank you and good afternoon Judge Wilkins may it please the court my name is Paul Warner and I represent SES Americom SES is one of the largest incumbent satellite operators with business on the seabed that is already actively working to transition its businesses services and customers into the upper 200 megahertz band to free up significant spectrum for deployment of revolutionary 5G services with my limited time I'd like to focus on the payment issues and I'd like to pick up with Judge Walker's observation that the SSOs do not have standing to challenge the payments being made by third party wireless overlay licensees to third party incumbents they plainly don't and I would point the court to this court's decision in a mobile relay case in order to have competitor standing as they're alleging here they need to be current and direct competitors they're not and that brings me to a fundamental distinction between the SSOs in the one hand and the incumbent satellite operators on the other the FCC made a technical assessment based on its core competency in this area that the SSOs are nothing more than paper networks they hold authorization but the FCC concluded based on the evidence that they did not launch their satellite to provide services in the C-band in the United States they have no C-band business now they have no earth stations in the C-band in the United States and because of the technical limitations of their satellite and the past business they have provided using the C-band they are unlikely the FCC predicted to provide services in the future they're free to do so in the same amount of spectrum going forward that is left for the incumbents who have real business in the C-band the incumbents have billions of dollars of business in the C-band SES alone has 16 satellites to provide C-band service in the United States it has more than 100 customers it has more than 100 services and it is being impacted seriously by the transition along with the other incumbents who actually have services being provided to US earth stations which number in the tens of thousands in fact there are 16,000 plus earth stations that are going to be impacted by the transition so as a result of their licenses being modified the FCC properly determined that the incumbents will incur real and actual and substantial cost this is an unprecedented undertaking that the commission has set the incumbents out to accomplish on an expedited time frame and I just want the court to understand the expedited nature and the significant undertaking that is required to transition out of the lower 300 MHz Mr. Mr. do you agree that your petition at this point should be dismissed the petition yes okay so as I was saying and I recognize my time is up but the incumbent satellite operators in order to transition the services are already incurring substantial costs in the order of billions of dollars those costs are set out in transition plans filed with the commission and they will be vetted and reimbursed through an independent clearinghouse now quickly just on the incentive payment those payments are to incentivize SES and the other incumbents to take on voluntarily the massive cost the logistical challenges and the business and execution risks to carry out the transition at a breakneck speed all while seamlessly delivering video and radio content to more than 100 million US households the FCC correctly recognized it would take a substantial incentive for the incumbents to take on that profound task given the risks and costs involved and the FCC did not accept the amount that the incumbents actually sought to perform that accelerated relocation. The FCC provided an amount far less than that. That amount that the FCC actually approved is also far less than the value that the incumbent satellite operators are going to deliver to the American public by freeing the spectrum on an accelerated timeline. It's also less than the value to the wireless overlay licenses of obtaining the spectrum early. If there are no further questions, I'm happy to answer any questions, but if there are no questions, I see my time is up, and we would ask that the commission's order be affirmed. Okay. Judge Katsas, Judge Walker, any questions? No. All right. Thank you, counsel. So now, rebuttal for Mr. Gavin. I believe you are out of time, but we'll give you two minutes. Thank you, Your Honor. I just wanted to address first Judge Walker's question. We reported to the commission on numerous occasions the issues of the power saturation and the difficulties that we're going to be encountered with being able to deal with frequency coordination. I would refer you, Judge Walker, to our ex parte that were filed May 6 of 2019. That's JA270. November 15, 2019, that's JA380. January 8, 2020, which is JA401, and February 20, 2020, which was JA464. The Miami Hard Rock Stadium was an example that was provided afterwards, but we addressed the issues prior to that. I also wanted to, with my time remaining, just to touch on something that counsel for the commission said. I repeat what we said from the beginning. We were concerned even about 100 MHz being reallocated, but we ultimately accepted the idea that 200 MHz could be allocated, and if my calculations are correct, something like Miami, and I'm guessing others of those frequency coordination studies would still work if it were only 200 MHz being transitioned. The last thing is the issue of programming demand, and we submitted in our briefs and cited in the record repeated assertions by, among others, the NAB at JA444 about the importance of occasional use and ESPN specifically reporting that there was an increased demand that they had for C-band services in these last several years. That is at JA278. I thank your honors, and I repeat, we seek that the order be vacated, and thank you for consideration of this more argument. Thank you, Mr. Gavin. Mr. Wright, you were out of time, but we'll give you two minutes for rebuttal. Thank you, your honor. On modification and notice, so it was noted that the FCC hardly defends its existing customer standard, even though the commission articulated that many times. It was suggested as we, of course, think that it's an arbitrary and capricious standard. The following test about sort of whether or not we would be able to build customer base in the future is sort of an extension of the existing customer's test. So if the existing customer's test isn't the applicable test, I don't think we could have known that the commission would say, well, okay, how about future customers? And so we just didn't have notice of that, and no one has cited any case, again, where a licensee got moved without getting full replacement spectrum and or money, you know, except motion. So my friends in the wireless industry, you know, basically say this rule would be unlawful if applied to them, and the commission in paragraph 143 of the order sort of gave away that this was a one-time only rule that would be applied, and I think that simply shows it's unlawful. I would also note that Mr. Karanja articulated the   commission thinks it should apply and Congress thinks it should apply with respect to determining the payments beyond payments for actual relocation costs, that standard is to determine the amount of compensation the licensees would accept to move. The SEC thinks it has authority to order them to move. We actually agree, but it has to compensate them for doing so. One other point, SES will get all of its relocation costs covered, including any relocation costs to do it faster, to do it on an accelerated basis. I hope the court understands that and that the $9.7 billion is simply pure profit rather than compensation for expenses. Thank you, Mr. Wright. We have all of your arguments and the cases submitted.
judges: Wilkins, Katsas, Walker